UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
Caption in compliance with D.N.J. LBR 9004-1

PAUL W. VERNER, ESQUIRE
VERNER SIMON
Five Greentree Centre
525 Rt. 73 North, Suite 104
Marlton, NJ 08053
Tel: (856) 817-6315
Fax: (856) 817-6017
*Proposed Counsel to the Debtor*

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>SMS Enterprises Inc., *et al*,[1]<br><br>Debtor | Chapter 11<br><br>Case No. 19- 21332 (ABA)<br><br>Jointly Administered |

**DECLARATION OF ERIC SALISBURY IN SUPPORT OF**
**DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Eric Salisbury, hereby declare under penalty of perjury:

1.  I am the CEO of SMS Enterprises Inc., *et al* (the "**Debtor**"), a corporation organized under the laws of New Jersey, whose headquarters is located in Millville, New Jersey, and the above-captioned debtor and debtor in possession. I have served in this role since 1994, although I began working in a managerial role since April, 1988.

_____

[1] The Debtors in these cases and the last four digits of their employee identification numbers are SPS Enterprises Inc. EIN 2466 and ETA Enterprises Inc. EIN 3019

2. My experience in the food service industry started in 1979 when I started working at a local Burger King while in High School. After graduation I continued to work for Burger King and worked my way up very quickly into a management role. By the age of 22, I was a General Manager and by 26 years of age, I was doing classroom training for other Burger King Chain managers & prospective franchisees. In April 1988, I moved to a Franchise Group in Maryland and became the District Manager. In 1991 the group sold to a new Franchise in New Jersey where I became a 25% operating partner. In 1994 I purchased all three Burger King locations from the other partners.

3. I handle with the help of the general managers the day-to-day operations, business and financial affairs, and books and records. I submit this declaration to assist the Court and parties in interest in understanding the circumstances compelling the commencement of this Chapter 11 Case, and in support of the Debtor's chapter 11 petition and certain motions and applications filed today.

4. Except as otherwise indicated, all facts in this declaration are based upon my personal knowledge, my review of relevant documents and information concerning the operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  I am over the age of 18 and authorized to submit this declaration.

**Preliminary Statement**

5. The Debtors corporations are comprised of four Burger King Restaurants located in New Jersey. These are fast food chains providing quality food for a reasonable value.

6. The Debtor was incorporated as a New Jersey Corporation in 1994. The debtor operates four Burger King locations in New Jersey with the headquarter located in Millville.

7. To familiarize the Court with the Debtor, its business, the circumstances leading to this Chapter 11 Case, and the relief the Debtor is seeking in those certain motions and applications filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtor's
- **Part II** describes the circumstances leading to this Chapter 11 Case;
- **Part III** describes the Debtor's proposed strategy to emerge from chapter 11; and
- **Part IV** sets forth the evidentiary basis for the relief requested in each of the first day motions.

**I.      SMS Enterprises Inc. *et al***

8. The Debtor was founded in 1994 and is headquartered in Millville, New Jersey.

9. The Debtor has a loyal working class customer base located in the general areas of each of the businesses. All four Burger King stores located in New Jersey have General Managers and staff capable of operating the businesses properly.

10. The Debtor's products are priced comparable to other fast food chain businesses and product costs are appealing to primarily working and lower socio-economical class men and women who want a quality food product prepared in a quick manner and a cost that is feasible for their monthly income budget.

**A.      The Debtor's Business Operations.**

      1.      **The Debtor's Geographical.**

11. *Brick-and-Mortar Presence*.

The debtor's business is comprised of four Burger king Franchises. One located in

New Jersey.

2. **Overview of the Debtor's Merchandise and Key Customer Base.**

12. As discussed previously, the Debtor offers fast food products appealing to working and lower socio-economical class men and women who want a quality food product prepared in a quick manner and a cost that is feasible for their monthly income budget.

B. **Critical Components of the Debtor's Cost Structure.**

1. **Supply Chain.**

13. The Debtor purchases its inventory primarily through Supply Agreements with Maines, Coca Cola and Stroehmann/Bimbo.

2. **Employee Compensation and Benefits.**

14. The Debtor employs 110 employees, including 30 full-time employees and 80 part time employees(collectively, the "**Employees**"). the Debtor anticipates that its monthly gross Employee Compensation, including wages, salaries, and related compensation, will be reduced from $165,000 during the pendency of this Chapter 11 Case. The Debtor offers its Employees the ability to participate in a number of insurance and benefits programs, including, among other programs, medical and dental plans, life insurance, workers compensation, retirement plans, paid time off, and other employee benefit plans.

3. **Real Estate Obligations.**

15. The Debtor leases all of its locations. The Debtor estimates that the aggregate occupancy costs for the Debtor's freestanding post-petition stores will be feasible in fiscal year 2019.

II. **Events Leading to this Chapter 11 Case.**

16. The financial downfall of the business began in 2013 when Burger King discounted all of the products against the wishes of the franchisees. This devalued our product and had kept us in a reduced income period for five years. In addition to this in 2015 our business continued to further decline due to the reduction of employment in Atlantic City, our primary customer base, and the inclement winter weather. In an effort to help financially maintain the businesses a high interest loan was taken out. Each of these loans due to the high monthly payments precipitated another loan to help fund the previous and continue to maintain the businesses monthly operating obligations. In April of 2019 the business could no longer continue to operate and maintain these high interest loans. After review of the books it was decided that the only way to reorganize this debt and protect the continued operations of the business was to file for Chapter 11.

4. **Launch of the New Strategic Plan**

17. The Debtor, recognizing the need to critically reevaluate its business, has developed a comprehensive operational restructuring to simplify its business and build on the core strengths of SMS Enterprises *et al* (the "**New Strategic Plan**"). The New Strategic Plan consists of several fundamental components: (a) refocusing on product assortment and targeted in-demand products; its reach; (b) enhancing the customer experience (quality/level of staff and training); (c) optimizing targeted marketing ; (d) implementing significant organizational changes; Fundamental to this New Strategic Plan is a

realigned financially optimized structure that will enable SMS Enterprises Inc., etal to successfully emerge from this Chapter 11 Case.

**(a)    Refocusing on Product Assortment**

18.     The *first* component of the New Strategic Plan Burger King is introducing some aggressive new marketing & Products such as tacos and a Cheddar parmesan hamburger platform which aims to shift the company's focus and efforts to maximizing the potential of its products. This component of the New Strategic Plan involves, among other things, a focus on reinforcing trend-right/in-demand products and bringing the highest quality at an affordable price innovation in the Debtor's products, and a renewed focus on customer demand.

**(b)    Enhancing the Customer Experience.**

19.     The *second* component of the New Strategic Plan seeks to improve the customer experience to drive customer conversion. The Debtor expects to achieve that goal by (a) implementing impactful in-store marketing and event initiatives to maximize product relevance, (b) increase in-store management and employee programs and initiatives both from a product and selling skills perspective, which is key to achieving incremental customer conversion, (c) lessening administrative burdens, so the staff can focus on the customer, and (d) ensuring that the customer's experience is optimal.

**(c)    Optimizing Targeted Marketing.**

20.     The *third* component of the New Strategic Plan aims to refocus the Debtor's marketing efforts on the "targeted" customer to build traffic in all of its locations. This strategy involves (a) improving communication between management and employees, (b) improving the effectiveness of existing and new future marketing.

### IV. The Proposed Strategy to Emerge from Chapter 11.

21. Upon implementing the New Strategic Plan, the Debtor expects to be in a position where it can see the path to profitability in the short term. In so doing, the Debtor also expects to be able to persuade its key constituents of the value of continuing to work with the Debtor and allowing the Debtor to grow. The Debtor will need to instill confidence in its landlords and vendors. The Debtor is hopeful that this can be achieved in the near term, such that (a) its creditors will agree to accept payments via a chapter 11 plan.

### V. Evidentiary Support for First Day Motions.

22. Contemporaneously with the filing of this Declaration, the Debtor has filed a number of first day motions (each, a "**First Day Motion**" and, collectively, the "**First Day Motions**") seeking relief that the Debtor believes is necessary to enable it to efficiently administer its estate with minimal disruption and loss of value during this Chapter 11 Case. The Debtor requests that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtor's estate. I believe that the relief requested in the first day motions is necessary to allow the Debtor to operate with minimal disruption during the pendency of this Chapter 11 Case. I have reviewed each of the first day motions discussed below, and the facts set forth in each first day motion are true and correct to the best of my knowledge and belief. Descriptions of the relief requested in and the facts supporting each of the first day motions are set forth in **Exhibit A** attached hereto and incorporated herein by reference.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements

Dated: June 7, 2019 /s/ Eric Salisbury
Eric Salisbury
Chief Executive Officer

[*Remainder of page intentionally left blank*]

**EXHIBIT A**

**Evidentiary Support for First Day Motions** (1)

I.  **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtor to: (A) Continue Using Its Cash Management System and (B) Maintain Existing Bank Accounts and Business Forms; and (II) Granting Related Relief (the "Cash Management Motion").**

1. Pursuant to the Cash Management Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to (a) continue to utilize its prepetition Cash Management System and (b) maintain its existing Bank Accounts and utilize its existing Business Forms in the ordinary course of business.

2. The Debtor utilizes the well-established and efficient mechanisms of the Cash Management System for collection, concentration, management, and disbursement of funds used in its business activities.

3. The Cash Management System is comparable to centralized cash management systems used by similarly situated companies to manage the cash of numerous operating units in a cost-effective, efficient manner. The Debtor designed the Cash Management System to meet its specific operating needs and uses the Cash Management System in the ordinary course of its businesses to collect, transfer, and disburse funds generated from its business activities and to facilitate cash monitoring, forecasting, and reporting.

4. The Debtor manages the Cash Management System at its headquarters in Milltown, New Jersey. Among other things, the Cash Management System enables the Debtor to conduct efficient electronic transfers of funds, thereby reducing the administrative burden of manual transfers and the costs associated therewith. The Debtor's finance personnel maintain oversight over the Cash Management System and implement cash management controls for processing and releasing funds.

on account of prepetition debts without the prior approval of the Debtor's management and this Court.

6. Because of the disruption that would result if the Debtor was forced to close its existing Bank Accounts, I believe it is critical that the existing Cash Management System remain in place. I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business in chapter 11. Accordingly, on behalf of the Debtor, I respectfully submit that the Cash Management Motion should be approved.

II. **Debtor's Motion Seeking Entry of Interim and Final Orders (I) Authorizing, but Not Directing, the Debtor to Pay and Honor Prepetition Employee Obligations; (II) Maintain and Continue Certain Compensation and Benefits Programs Postpetition, and (III) Granting Related Relief (the "<u>Wages Motion</u>").**

7. Pursuant to the Wages Motion, the Debtor seeks entry of interim and final orders authorizing, but not directing, the Debtor to (i) pay prepetition wages, salaries, other compensation, withholding obligations, payroll processing fees, reimbursable employee expenses, non-insider employee incentive programs and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto.

8. The Debtor employs approximately 110 Employees, including approximately 30 full-time Employees and 80 part-time Employees. The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtor's estate. In certain instances, the Employees include personnel who are intimately familiar with the Debtor's business, processes, and systems, and who cannot be easily replaced.

9. I believe that preserving and maximizing the value of the Debtor's estate depends on a stable workforce and that any delay in paying the Prepetition Employee Obligations will

adversely impact the Debtor's relationships with its workforce and could irreparably harm morale, dedication, confidence, and cooperation. Furthermore, I believe that employee departures could jeopardize the stability of the Debtor's workforce, posing substantial risk to the Debtor's continued operations.

10. The majority of Employees rely on the Employee Compensation to pay their daily living expenses. Additionally, certain of the Employees take advantage of the benefit programs offered by the Debtor, including the Health Plans, and if the Debtor is not authorized to pay the Prepetition Employee Obligations and continue the benefit plans in the ordinary course of business on a postpetition basis would be forced to either forego coverage entirely or obtain potentially expensive coverage to maintain those benefits.

11. The Debtor seeks to minimize the personal hardship the Employees would suffer if the Prepetition Employee Obligations are not paid when due or as expected.

12. I believe that payment of the Prepetition Employee Obligations is a necessary and critical element of the Debtor's efforts to preserve value and will give the Debtor the greatest likelihood of retention of its Employees as the Debtor seeks to operate its business in this Chapter 11 Case.

13. The Debtor also requests that the Court approve a continuation of medical benefits (COBRA) for no longer than four (4) months following his or her last date of service with the Debtor.

14. I believe that the relief requested in the Wages Motion inures to the benefit of all parties in interest. Accordingly, on behalf of the Debtor, I respectfully submit that the Court should approve the Wages Motion.

**III.    Debtor's Motion for Interim and Final Orders (I) Authorizing Payment of Certain Prepetition Taxes and Assessments and (II) Directing Financial Institutions to Honor and Process Related Checks and Transfers (the "<u>Tax Motion</u>").**

15. The Debtor requests authority to: (a) pay various Taxing Authorities all Taxes that

arose prior to the Petition Date, including all Taxes subsequently determined by audit or otherwise to be owed for periods before the Petition Date; and (b) direct the Banks to receive, honor, process, and make payments relating to the Taxes. Only current Taxes for which the last day to pay without incurring a penalty has not expired will be paid, unless otherwise authorized and ordered by the Court.

16. In connection with the normal operation of its business, the Debtor collects, withholds and/or incurs an assortment of Taxes that it remits periodically to various Taxing Authorities. The Debtor must continue to pay the Taxes to avoid potential costly distractions during this Chapter 11 Case. Specifically, the Debtor's failure to pay the Taxes could adversely affect the Debtor's estate because the governmental authorities could file liens or seek to lift the automatic stay. Additionally, failure to satisfy the Taxes may jeopardize the Debtor's maintenance of good standing to operate in the jurisdictions in which it does business.

17. I believe that the relief requested in the Tax Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its businesses in this Chapter 11 Case without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Tax Motion should be approved.

**IV.** **Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Insurance Coverage Entered into Prepetition and Satisfy Prepetition Obligations Related Thereto, Including Broker Fees and (B) Renew, Supplement, or Purchase Insurance Policies; (II) Authorizing Banks to Honor and Process Check and Electronic Transfer Requests Related Thereto; and (III) Granting Related Relief (the "<u>Insurance Motion</u>").**

18. The Debtor requests authority to: (i) continue honoring its obligations under the Insurance Policies and satisfy payment of prepetition obligations related thereto, including the payment of related broker fees; (ii) renew, supplement, modify, extend or purchase insurance

coverage in the ordinary course of its business on a postpetition basis; and (iii) direct the Banks to honor and process payment requests related to the foregoing.

19. The Insurance Policies are critical to the preservation of the Debtor's property, and nonpayment of any premiums, deductibles, or similar obligations under any of the Insurance Policies could result in one or more of the Insurance Carriers (a) terminating the existing policies, (b) declining to renew the Insurance Policies, or (c) refusing to enter into new insurance agreements with the Debtor in the future.

20. I understand that, in many cases, insurance coverage such as that provided by the Insurance Policies is required by diverse regulations, laws, and contracts. Failure to make the payments required by the Debtor's Insurance Policies could have a significant negative impact on the Debtor's operations.

21. I believe that the relief requested in the Insurance Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest, and will enable the Debtor to continue to operate its business during this Chapter 11 Case without disruption. Accordingly, on behalf of the Debtor, I respectfully submit that the Insurance Motion should be approved.

V. **Debtor's Motion for Authority to Retain and Compensate Professionals Used in the Ordinary Course of Business** *Nunc Pro Tunc* **to the Petition Date (the "OCP Motion")**

22. Pursuant to the OCP Motion, the Debtor seeks authority to retain and compensate professionals used by the Debtor in the ordinary course of business as of the Petition Date and thereafter for services including but not limited to, ongoing litigation matters, accounting, and auditing services.

23. Under the terms of the OCP Motion, each Professional will be limited to payment of $10,000 per month for fees incurred and reimbursement of necessary expenses.

24. It is essential that the employment of the Ordinary Course Professionals, who are already familiar with the Debtor's affairs, be continued on an ongoing basis to enable the Debtor to conduct, without disruption, its ordinary business affairs. The relief requested in the OCP Motion will save the Debtor the expense of separately applying for the employment of each Professional and, likewise, will spare the Court and the Office of the U.S. Trustee from having to consider numerous fee applications involving relatively modest amounts of fees and expenses.

25. The Debtor submits that the proposed employment of the Ordinary Course Professionals and the payment of compensation on the basis set forth in the OCP Motion is in the best interests of the Debtor's estate and, on behalf of the Debtor, I respectfully request that this Court grant the relief requested in the OCP Motion.

**VI.   Debtor's Application for Entry of an Order Authorizing pro hac vice admittance of Richard J. Gerace as Special Counsel to the Debtor**

26. Pursuant to the Application for pro hac vice admittance, the Debtor seeks authority to retain Richard J. Gerace as its Special Counsel to the debtor.

27. The Debtor seeks to admit Richard J. Gerace as its special counsel because Gerace has extensive expertise, experience and knowledge in the field of debtors' and creditors' rights and business reorganization under the Bankruptcy Code as well as other areas of the law where the Debtor may need advice and Guidance.

28. Gerace began working with the Debtor in approximately March 2019 and since that time has become intimately familiar with the Debtor's operations, finances, systems, capital structure and personnel, as well as the current circumstances surrounding the Debtor, the challenges it faces, and the associated legal issues.

VII. Motion for an Order Extending Time for Debtor to File its Schedules of Assets and Liabilities and Statement of Financial Affairs (the "**Extension Motion**")

29.     The Extension Motion seeks an extension through and including September 1, 2019 for the Debtor to file its Schedules of Assets and Liabilities and its Statement of Financial Affairs.

30. The additional time requested by the Debtor to prepare and file its Schedules and Statement will help the Debtor make a smoother transition into chapter 11 and, therefore, ultimately maximize the value of its estate for the benefit of creditors and all parties-in-interest.

31.     On behalf of the Debtor, I respectfully request that the Court grant the relief requested in the Extension Motion.

**VIII    Motion Seeking Joint Administration of Multiple Bankruptcy Cases**

32. The Joint administration of this case will allow for all corporate cases to be handled in the Lead bankruptcy case SMS Enterprises Inc. and avoid additional unnecessary administrative cost and expense.

**VIII    Motion for an Order Pursuant to Bankruptcy Code 366 regarding Adequate Assurance for the Future Performance for Utilities and Establishing procedures for Determining requests for Additional adequate assurance.**

33. This Motion will allow continuation of critical utilities necessary to continue business operations with adequate assurance allowed for these companies.